[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 2, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12924

_____

D. C. Docket No. 01-00028-CR-01-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARL M. DRURY, JR., M.D.,
Doctor,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(September 2, 2003)**

Before BARKETT, MARCUS and ALARCÓN*, Circuit Judges.

BARKETT, Circuit Judge:

_____

* Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Dr. Carl M. Drury, Jr. appeals his convictions for using a facility in interstate commerce to effect a murder-for-hire scheme, in violation of 18 U.S.C. § 1958(a), and for possessing a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c). Drury contends that the government failed to adduce sufficient evidence at trial to establish the jurisdictional element of § 1958(a). In addition, Drury argues that the district court committed reversible error by: 1) instructing the jury that the use of a pay or cellular phone constitutes a per se use of a facility in interstate commerce, as that phrase is used in § 1958(a); 2) prohibiting him from introducing evidence of his character for truthfulness; 3) refusing to admit testimony from his son regarding a prior consistent statement that Drury made after his arrest; and 4) denying his requested jury instructions.

We find that the evidence presented at trial sufficiently established the requisite jurisdictional nexus under § 1958(a) and that the district court committed no reversible error. Therefore, we **AFFIRM** Drury's convictions.

## I. BACKGROUND

The unusual sequence of events that culminated in Drury's convictions began with Bureau of Alcohol, Tobacco, and Firearms ("ATF") Agent Steven Whatley's separation from his wife. Drury, a longtime friend and family physician, offered to let Whatley reside at his home. Whatley accepted this offer and stayed with Drury for the next several months.

2

During their time together, Drury complained bitterly about his wife Mary. Drury told Whatley that he needed "some relief" from his wife and joked that "it had to look like an accident." Eventually, Drury asked Whatley if he might be able to find someone to kill his wife. Drury also inquired whether Whatley could modify a pistol to make it fully automatic and "quieter."

Whatley reported this conversation to his supervisor at the Federal Law Enforcement Training Center ("FLETC"), who arranged a meeting with ATF Agents John Limbach and Louis Valoze. The agents provided Whatley with Agent Valoze's undercover cellular phone number and instructed him to give Drury the number upon request. Valoze's cellular phone number was registered in a South Georgia area code. Drury called Agent Valoze's cellular phone from a pay phone, introduced himself as Whatley's friend, and arranged to meet Valoze the next day. This telephone call was recorded. During the call, and all subsequent phone conversations between Agent Valoze and Drury, both men were physically located in Georgia.

As planned, Drury met with Valoze the next day to discuss the murder of Drury's wife. At the meeting, Valoze told Drury that he required a gun and a fee of $2,000. Drury provided Valoze with detailed information regarding his wife, including her place of employment, the type of car she drove, her work schedule, and her habits. He stressed to Valoze that "[i]t just needs to be an accident." At

3

the conclusion of the meeting, Drury informed Valoze that he would call him in a couple of days. Drury did so and provided Valoze with the tag number of his wife's car. He also negotiated Valoze's price for the murder down to $250.

The men met again several days later, and Drury provided Valoze both the $250 and a .38 caliber Taurus handgun. Drury told Valoze that if his wife agreed to sign their divorce papers, the money would only be "to follow her" and see if she was seeing another man. But if Mary refused to sign the papers, "we'll go ahead." The men agreed that Drury would call Valoze at the end of the week with this information.

When Drury called Agent Valoze, he indicated that Mary had not signed the papers, that he should proceed with the plan, and that his wife was staying at her sister's home, so he could "catch her on the way back. [I]t'll be a good, good time." Valoze informed Drury that he would "get it done." Following this conversation, ATF agents arrested Drury.

At trial, the government introduced expert testimony from representatives of BellSouth Telecommunications, the company that serviced the pay telephones Drury used to contact Valoze, and VoiceStream Wireless, the company that serviced Valoze's cellular phone. The BellSouth representative testified that all calls from the phones that Drury used are routed to the Brunswick, Georgia switching center where they are switched to the requested destination, be it local,

4

interstate, or international. The signal from a purely local call would not leave Georgia, but a call to a cellular phone might. The VoiceStream representative testified that Drury's calls to Valoze's cellular phone were all routed out of Georgia to the company's Jacksonville, Florida switching center.

Drury based his defense on the theory that the entire murder-for-hire scheme was, in reality, just an ATF role-playing exercise. He testified at trial that he never spoke with Whatley about killing his wife. Rather, their conversations centered on the possibility that Mary was having an affair. According to Drury, he informed Whatley that he wanted to hire a private investigator to surveil Mary, but could not afford to do so. Whatley had then advised Drury about a role-playing training program at the ATF.[1] Whatley told Drury that if he entered the program and pretended to seek a murder-for-hire, ATF agents would place Mary under surveillance as part of the exercise. Drury testified that all conversations between himself and Agent Valoze were a product of his belief that they were engaged in role-play. He denied ever actually intending to have Mary killed and stated that he thought the $250 fee was simply reimbursement for the surveillance. As evidence of his belief that the scheme was a role-playing exercise, Drury noted that the purported "trigger" for going ahead with the plan – Mary signing the divorce

---

[1] Whatley testified at trial and denied ever discussing or engaging in role-play with Drury. In turn, Drury called two character witnesses, Ted Turner and Joseph Bridgers, who testified that Whatley had a reputation for being untruthful.

5

papers – was, in fact, a falsification; the couple had no plans to divorce. Mary's testimony at trial corroborated the fact that the two had never discussed divorce.

Drury also attempted to introduce testimony from his son, Don, recounting a conversation they had the night Drury was arrested. Don had spoken to Drury immediately following the arrest, while Drury was still in the arresting officer's vehicle, and sought to testify that Drury had told him of the role-playing exercise. The government objected, arguing that the testimony was not admissible because Drury had a motive to fabricate the story after his arrest since he had not informed anyone of the role-playing exercise prior to his arrest. The district court ruled Don's testimony inadmissible.

Drury additionally sought to introduce testimony regarding his character for truthfulness under Rule 608 of the Federal Rules of Evidence. The government responded that Rule 608 did not apply because it had never questioned Drury's character, only his credibility. The district court agreed and excluded the testimony.

Prior to trial, Drury had submitted two requested jury charges regarding improper government investigations and witness credibility as follows:

> I instruct you that you may consider such evidence, including improper investigative techniques, in evaluating the credibility of the government witnesses. In other words, an investigation that is thorough and conducted in good faith may lead to more credible evidence than an investigation that is incomplete, negligent, or conducted in bad faith. In deciding the credibility

6

of law enforcement witnesses, you may consider whether the investigation was conducted according to proper protocol and was complete.

I further instruct you that if the government improperly, or inadequately investigated one aspect of this case, you may infer that the government inadequately, or improperly investigated other aspects of the case, as well. Based on this inference alone, you may disbelieve certain government witnesses.

Drury's second proposed jury instruction was 11th Circuit Pattern Jury Instruction

(Criminal Cases), Basic Instruction 6.7 at 30 (West 1997):

There may also be evidence tending to show that a witness has a bad reputation for truthfulness in the community where the witness resides, or has recently resided; or that others have an unfavorable opinion of the truthfulness of the witness. You may consider those matters also in deciding whether to believe or disbelieve such witness.

The district court did not give either instruction. Instead, as part of its preliminary

instructions prior to opening statements, the district court instructed the jury that:

[Y]ou are the only people who can determine the credibility or the believability of the witnesses. You are the sole judges of the credibility of the witnesses and the weight to be accorded to the testimony and the evidence . . . . What you are going to see is that in determining the credibility of the witnesses you will use the same criteria that you use in your daily life. The same things that you use to determine the credibility or the believability of the witnesses, are exactly the same sorts of things that you use in your daily lives when you are trying to decide whether or not you can believe somebody about a very important matter.

At the close of the trial, the judge provided the following instruction:

In deciding whether you believe or do not believe any witness, I suggest that you ask yourself a few questions: did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the

7

case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

The district court also informed the jury that, as a matter of law, "pay phones and cellular phones are 'facilities in interstate commerce' under federal law." Drury objected to this charge and to the district court's refusal to give his requested instructions.

The jury found Drury guilty of both the murder-for-hire scheme and the firearms violation. The district court subsequently sentenced Drury to 204 months' imprisonment. Drury filed a timely appeal with this Court.

## II. DISCUSSION

### A. The Necessary Interstate Commerce Nexus

Drury first argues that the government failed to adduce sufficient evidence at trial to establish the jurisdictional element of 18 U.S.C. § 1958(a). Specifically, Drury contends that the government did not show that he used a facility in interstate commerce with the intent to commit a murder-for-hire, as required by the statute. Although Drury concedes that each of the calls that he made to Valoze's cellular phone were routed through VoiceStream's Jacksonville, Florida switching center, he nonetheless contends that such contacts are insufficient to satisfy § 1958(a)'s interstate commerce requirement.

8

The government argues that it was only required to prove that Drury used a means of communication <u>capable</u> of traveling interstate to impose liability under the statute. Alternatively, the government argues that even if the statute requires that a "facility" actually be used in interstate commerce, Drury's call, which was routed through another state, satisfies that requirement. Thus, we are called upon to interpret and apply 18 U.S.C. § 1958,[2] which provides as follows:

<u>Use of interstate commerce facilities in the commission of murder-for-hire</u>.

(a) **Whoever** travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or **uses** or causes another (including the intended victim) to use the mail or **any facility in interstate** or foreign **commerce,** with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

(b) **As used in this section** and section 1959–
    (1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;
    (2) **"facility of interstate commerce" includes means of transportation and communication**; and
    (3) "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

---

[2] We note that we are not called upon to decide the constitutionality of this Section, and thus <u>United States v. Lopez</u>, 514 U.S. 549 (1995), which discusses the parameters of Congress's power to legislate pursuant to the Commerce Clause, has no relevance here.

18 U.S.C. § 1958 (emphases supplied).

The statute finds its origins in the Interstate Travel in Aid of Racketeering Statute ("the Travel Act"). See 18 U.S.C. § 1952 (1961), amended by 18 U.S.C. § 1952A (1984). The Travel Act federalized the prosecution of organized crime and racketeering offenses that cross state borders. It originally covered "unlawful activity" associated with organized crime (e.g., gambling, prostitution, liquor, and narcotics), but did not include murder-for-hire as a distinct offense.[3] See Rewis v. United States, 401 U.S. 808, 811 (1971) ("Legislative history of the [Travel] Act is limited, but does reveal that § 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another.").

In 1984, Congress passed the Comprehensive Crime Control Act, which amended the Travel Act to include the crime of murder-for-hire.[4] See 18 U.S.C. §

---

[3] Section 1952 of the Travel Act, entitled "Interstate and foreign travel or transportation in aid of racketeering enterprises," read as follows:

> (a) Whoever travels in interstate or foreign commerce or uses any facility or foreign commerce, including the mail, with intent to--
> > (1) distribute the proceeds of any unlawful activity; or
> > (2) commit any crime of violence to further any unlawful activity . . .
> (b) As used in this section "unlawful activity" means
> > (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or
> > (2) extortion or bribery in violation of the laws of the State in which committed or of the United States.

18 U.S.C. § 1952 (1961).

[4] The Comprehensive Crime Control Act of 1984 added 18 U.S.C. § 1952A to the Travel Act:

> (a) Whoever travels in or causes another (including the intended victim) to travel in

10

1952A (1984), amended by 18 U.S.C. § 1958 (1988).  The interstate nexus

requirement set forth in § 1952A closely mirrored the language used in the original

version of the Travel Act under § 1952.

In 1988, Congress passed the Anti-Drug Abuse Act of 1988, which, inter

alia, recast § 1952A as § 1958.  See 18 U.S.C. § 1958 (1988).  The text of § 1958 is

identical to the previous version under § 1952A, save the addition of the phrase "or

who conspires to do so" after the words "pecuniary value."[5]

We begin our analysis with the text of the statute.  We must first discern the

burden that § 1958(a)'s jurisdictional element imposes upon the government and

then judge whether the government met this burden.

---

interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined . . . .
(b) As used in this section and section 1952B
    (1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage; and
    (2) "facility of interstate commerce" includes means of transportation and communication.
18 U.S.C. § 1952A (1984).

[5] Congress slightly modified the murder-for-hire statute again in 1990, adding a new paragraph, § 1958(b)(3), which explains the usage of the term "State."  See Crime Control Act of 1990, Pub. L. No. 101-647, § 1205(k), 104 Stat. 4789, 4831 (1990).  Subsequent revisions to the statute were minor and did not alter the substantive language of § 1958(a) or § 1958(b).  See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, §§ 600003(a)(ii), 140007(b), 320105, 330016(1)(L), (N), (Q), 108 Stat. 1796, 1969, 2033, 2111, 2147-48 (1994) (increasing the maximum penalty for violations of the statute); Economic Espionage Act of 1996, Pub. L. No. 104-294, § 601(g)(3), 110 Stat. 3488, 3500 (1996) (fixing minor errors in the 1994 amendment).

### 1. *The Plain Meaning of 18 U.S.C. § 1958*

Our analysis begins with an examination of the language of the statute itself. See RJR Nabisco, Inc. v. United States, 955 F.2d 1457, 1460 (11th Cir. 1992). We must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341. When discerning a statute's plain meaning, courts must endeavor to give effect to all statutory provisions and construe related provisions in harmony with each other. See Borgner v. Brooks, 284 F.3d 1204, 1209 (11th Cir.) (citation omitted), cert. denied sub nom. Borgner v. Florida Bd. of Dentistry, 123 S. Ct. 688 (2002); Employees of the Dep't of Pub. Health & Welfare v. Department of Pub. Health & Welfare, 411 U.S. 279, 290 (1973) ("[D]ifferent provisions of the same statute normally should be construed consistently with one another.").

Two clauses in § 1958 are central to the instant case. The first, reduced to the relevant text, is "[w]hoever . . . uses . . . any facility in interstate . . . commerce." See 18 U.S.C. § 1958(a). The second is "'facility of interstate commerce' includes means of transportation and communication." See 18 U.S.C. § 1958(b)(2). While one might expect that the harmonization of two such

12

seemingly manageable clauses would be fairly easy to achieve, there is disagreement in our sister circuits as to § 1958's proper reach. Compare United States v. Weathers, 169 F.3d 336 (6th Cir.) (finding that § 1958 requires that the facility actually be used in interstate commerce), cert. denied, 528 U.S. 838 (1999); United States v. Paredes, 950 F. Supp. 584, 590 (S.D.N.Y. 1996) (same), aff'd, 162 F.3d 1149 (2nd Cir. 1998) (table), with United States v. Marek, 238 F.3d 310 (5th Cir.) (finding that using a facility capable of interstate commerce is sufficient), cert. denied, 534 U.S. 813 (2001).[6] At least two components of § 1958 contribute to this confusion.

First, it is unclear from the terms of subsection (a) whether the phrase "in interstate . . . commerce,"[7] modifies the spatially proximate noun "facility," see Marek, 238 F.3d at 316, or the more remote verb "use." See id. at 324-25 (Jolly, J. dissenting). If the former is the case, then "§ 1958's use of a 'facility in interstate commerce' is synonymous with the use of an 'interstate commerce facility.'" See id. at 313. As such, the focus of subsection (a)'s jurisdictional element would be on the type of facility used, not the manner in which it is used. Conversely, an interpretation focusing on the term "uses" suggests an alternative conclusion. "If

---

[6] Indeed, this disagreement among the circuits that have addressed this issue highlights that reasonable jurists can differ as to the statutory provision's proper meaning, rendering it ambiguous.

[7] As excerpted from the clause "[w]hoever . . . uses . . . any facility in interstate . . . commerce." 18 U.S.C. § 1958(a).

13

the phrase modifies use, then the statute clearly requires that the <u>particular use</u> be 'in interstate or foreign commerce.'" <u>Id.</u> at 325 (Jolly, J. dissenting) (emphasis supplied). <u>See also Paredes</u>, 950 F. Supp. at 587 (noting that "there are at least two grammatically cognizable interpretations -- one stressing 'use' and the other stressing 'facility.'").

Second, it is notable that while § 1958(a) utilizes the prepositional phrase "in interstate . . . commerce," § 1958(b) employs the conceptually distinct phrase "of interstate commerce." A plain reading of the phrase "in interstate . . . commerce" would seem to stress the <u>manner</u> in which the facility is used (<u>i.e.</u>, a use that actually implicates interstate commerce), whereas a similar evaluation of the phrase "of interstate commerce" implicates the <u>type</u> of facility that is used. This distinction is important. Under the former interpretation, the jurisdictional element of § 1958(a) could only be satisfied if the government proves that the defendant <u>actually used</u> the "facility in interstate commerce." Given the facts in this case, a construction that stresses the <u>manner</u> in which a facility is used would require that the government show that Drury placed a telephone call that actually traveled outside the state of Georgia. In contrast, under the government's view, an interpretation that stresses the <u>type</u> of facility used would dictate only that the means of communication utilized be <u>capable</u> "of interstate commerce." The government, therefore, argues that it is only required to demonstrate that Drury

14

used a telephone to solicit his wife's murder. It is unclear from the distinct prepositional phrases employed in § 1958(a) and § 1958(b) which of these very different definitions conveys the appropriate reach of the statute's jurisdictional nexus.

In short, the structure and language of 18 U.S.C. § 1958 make it impossible to discern a "plain and unambiguous meaning with regard to [§ 1958]." Robinson, 519 U.S. at 340; see also Paredes, 950 F. Supp. at 587 ("The phrase "use . . . any facility in interstate or foreign commerce" is inherently ambiguous."). As a consequence, we must resort to alternative canons of statutory interpretation. See United States v. Monsanto, 491 U.S. 600, 611 (1989).

## 2. All Words Must, To The Extent Possible, Be Given Meaning

"A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." United States v. Canals-Jimenez, 943 F.2d 1284, 1287 (11th Cir. 1991). "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" United States v. Menasche, 348 U.S. 528, 538-539 (1955) (quoting Montclair v. Ramsdell, 107 U.S. 147, 152 (1883)). Avoiding circumscription in our reading of the murder-for-hire statute requires that the two clauses at issue here be harmonized so that neither is rendered meaningless.

The government argues that the phrase "facility of interstate commerce" in § 1958(b)(2) simply defines the phrase "facility in interstate . . . commerce" in § 1958(a). This tactic assumes that Congress intended for the words "in" and "of" to be used interchangeably. But this deceptively simple construction is inherently problematic. Despite the convenience of equating the word "in" with the word "of," it is clear that the two terms are different. As a consequence, this approach runs counter to the very principle that it seeks to effect by "discard[ing] as being meaningless, redundant, or mere surplusage" § 1958(a)'s use of the word "in."[9] Canals-Jimenez, 943 F.2d at 1287. Moreover, it distorts the meaning of the word "uses" in the phrase: "Whoever . . . uses . . . any facility in interstate . . . commerce."

To avoid the shortcomings of equating two plainly different terms, we read § 1958(b)(2) in harmony with § 1958(a). An accord between the two subsections is achieved by recognizing that § 1958(b) merely provides examples of what might constitute a "facility" under the statute. This makes sense because § 1958(b)(2) does not even purport to be definitional, but rather explicitly uses language making it exemplary. See 18 U.S.C. § 1958(b). Unlike other statutes that clearly designate

---

[9] If we were to accept the proposition that different terms in a statute may be used interchangeably, then an equally plausible interpretation of the statute would be that § 1958(b)(2) meant to employ the phrase "facility in interstate commerce." Based on this view, § 1958(b)(2) simply provides examples of the modalities of interstate commerce that can satisfy § 1958(a) if they are used "in interstate commerce." See 18 U.S.C. § 1958(a).

a definitions section, § 1958 simply states that, "[a]s used in this section . . . 'facility of interstate commerce' includes means of transportation and communication." Id. (emphasis supplied). Because it is not intuitive that a "facility of interstate commerce" would include things such as a telephone or a passenger car, this provision does not "accomplish[] absolutely nothing," as the concurrence claims, but rather includes telephones in the types of "facilities of interstate commerce" that must be used in interstate commerce to satisfy § 1958(a). Read in this way, § 1958(b) does not conflict with § 1958(a), as it neither equates two different terms nor defines a phrase not present in subsection (a). Id. Thus, a faithful application of the dual principles that (1) a statute should not be read in a manner that renders its terms "mere surplusage" and (2) courts should try to harmonize distinct provisions in a statute lends support to the conclusion that § 1958 applies solely to facilities that are actually used in interstate commerce.[10] Other interpretive guides counsel the same result.

### 3. Clear Statement Rule

Particularly relevant to the instant case is the precept that "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the

---

[10] We therefore find ourselves in agreement with Judge Jolly's analysis in Marek, 238 F.3d at 324 (Jolly, J. dissenting), and with those cases holding that the facility's actual use must be interstate. See Weathers, 169 F.3d at 339; Paredes, 950 F. Supp. at 590.

language of the statute.'" Will v. Michigan Dep't of State Police, 491 U.S. 58, 65 (1989) (quoting Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242 (1985)). "[T]he clear statement rule . . . ensure[s] that attempts to limit state power [are] unmistakable, thereby structuring the legislative process to allow the centrifugal forces in Congress the greatest opportunity to protect the states' interests." Hutto v. Finney, 437 U.S. 678, 706 n.4 (1978) (Powell, J. concurring in part and dissenting in part) (quoting Laurence H. Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism, 89 Harv. L. Rev. 682, 695 (1976)). To apply the clear statement rule, we must first determine whether § 1958 generates federalism concerns and, if so, assess whether Congress made its intention to alter the federal-state balance clear in the text of the statute.

We find that § 1958 impinges upon the traditional powers of the states. As the Supreme Court has stated, "[w]hen Congress criminalizes conduct already denounced as criminal by the States, it effects 'a change in the sensitive relation between federal and state criminal jurisdiction.'" United States v. Lopez, 514 U.S. 549, 561 n.3 (1995) (quoting United States v. Enmons, 410 U.S. 396, 411-412 (1973)). Murder, whether by one's own hand or for hire, is a quintessential example of a crime traditionally considered within the States' fundamental police

18

powers.  Accordingly, § 1958's federalization of murder-for-hire crimes necessarily engenders a shift in the federal-state balance.[11]  See id.

In enacting § 1958, however, Congress failed to use "unmistakably clear" language that would signal its intent to alter this balance.  Instead, as discussed supra Part I(A)(1), the statute is ambiguous with regard to its jurisdictional nexus requirement.  In the absence of a clear statement of congressional design, the Supreme Court has refused to interpret ambiguous federal statutes in a manner that disrupts the delicate balance between state and federal power.  Gregory v. Ashcroft, 501 U.S. 452, 460-464 (1991).  Rather, the Court has instructed that when faced with two plausible interpretations of an ambiguous federal criminal statute, courts should generally apply the alternative that does not impute an intention upon Congress to invoke its full commerce power to regulate conduct traditionally controlled by the States.  See Enmons, 410 U.S. at 411-412; United States v. Bass, 404 U.S. 336, 349-350 (1971); Rewis, 401 U.S. at 812.  Given the ambiguity in § 1958, the plain statement rule directs us to construe the statute in a manner that minimizes the federal intrusion on state police powers.[12]  See Bass,

---

[11] Contrary to the concurrence's reasoning on this point, the clear statement rule is not applied only in cases where Congress has totally "deprived" the states of an area of traditional state legislative control.  Rather, the rule applies more broadly, such as when Congress "alter[s]," Will, 491 U.S. at 65, "upset[s]," Hilton v. S.C. Pub. Rys. Comm'n, 502 U.S. 197, 208 (1991) (O'Connor, dissenting), or "significantly change[s] the federal-state balance," United States v. Bass, 404 U.S. 336, 349 (1971), as it has done here in enacting § 1958.

[12] This maxim is particularly applicable here, where a broad reading of § 1958(a) would federalize virtually every murder-for-hire scheme.  Indeed, it is highly improbable that any

19

404 U.S. at 350. This aim is accomplished through a narrow interpretation of §

1958's jurisdictional element to require that the facility in question must actually

be <u>used in</u> interstate commerce.[13] <u>See id.</u>

### 4. The Rule Of Lenity

The rule of lenity is also applicable to our inquiry into the intended scope of

§ 1958's jurisdictional element. It states that "when there are two rational readings

of a criminal statute, one harsher than the other, we are to choose the harsher only

when Congress has spoken in clear and definite language." <u>McNally v. United</u>

<u>States</u>, 483 U.S. 350, 359-360 (1987); <u>see also Scheidler v. National Organization</u>

<u>for Women, Inc.</u>, 123 S. Ct. 1057, 1068 (2003) (applying the rule of lenity to the

Hobbs Act). Two vital functions are served by the rule:

> First, 'a fair warning should be given to the world in language that the
> common world will understand, of what the law intends to do if a certain
> line is passed. To make the warning fair, so far as possible the line should be
> clear.' Second, because of the seriousness of criminal penalties, and because

---

murder-for-hire could be set in motion without the participants availing themselves of at least one "facility <u>of</u> interstate commerce" (<u>e.g.</u>, land and cellular phones, walkie-talkies, automobiles, or the like) even though they may have traveled no further than next door within the state's borders. As discussed <u>infra</u> Part II(A)(5), the drafters of the Travel Act were acutely sensitive to this possibility and intended to guard against it.

[13] In contrast, "[a]llowing the government to meet the interstate commerce requirement through only a nominal showing of a connection to interstate commerce would do as much to 'completely obliterate' the distinction between national and local authority as if no jurisdictional requirement existed at all." <u>United States v. Odom</u>, 252 F.3d 1289, 1296 (11th Cir. 2001), <u>cert. denied</u>, 535 U.S. 1058 (2002).

> criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.

Bass, 404 U.S. at 348 (internal quotation, citations, and a footnote omitted). Given

ambiguity in a criminal statute, the rule of lenity counsels us to construe it more

narrowly. Id. at 347; see also Rewis, 401 U.S. at 812 ("In short, neither statutory

language nor legislative history supports such a broad-ranging interpretation of

[the Travel Act]. And even if this lack of support were less apparent, ambiguity

concerning the ambit of criminal statutes should be resolved in favor of lenity.")

(citing Bell v. United States, 349 U.S. 81, 83 (1955)). Applied to § 1958, this rule

instructs that § 1958(a)'s jurisdictional element should be interpreted to include

only the use of facilities that are actually engaged in interstate commerce.

## 5. *Legislative History*

Finally, although we do not find it necessary to rely on legislative history to

resolve the question before us, a review of § 1958's legislative history persuades us

that the aforementioned interpretive guides lead to the correct conclusion. As

stated previously, the modern federal murder-for-hire statute derives from the

Travel Act. See 18 U.S.C. § 1952 (1961). The Travel Act originated in a bill

forwarded to Congress by Attorney General Robert F. Kennedy on April 6, 1961.

Letter from Robert F. Kennedy, Attorney General, to the Vice President (Apr. 6,

1961), S. Rep. No. 87-644, at 4 (1961), reprinted in 1961 U.S.C.C.A.N. 2664, 2666

21

("Attorney General Letter of 1961"); see also United States v. Archer, 486 F.2d

670, 685 (2d Cir. 1973). This letter proposed a statute of limited scope aimed at

combating organized crime and racketeering:

> Because many rackets are conducted by highly organized syndicates whose influence extends over State and National borders, the Federal Government should come to the aid of local law enforcement authorities in an effort to stem such activity.

Attorney General Letter of 1961 at 4. Attorney General Kennedy made clear that

the proposed bill was intended to combat organized crimes that cross state or

national borders:

> The bill which I submit to the Congress would impose criminal sanctions upon the person whose work takes him across State or National boundaries in aid of certain "unlawful activities."

Id. Thus, an interstate nexus was central to the proposed legislation and justified

the federalization of the subject crimes. See also United States v. Nardello, 393

U.S. 286, 290 (1969) (quoting Kennedy's statement to the Committee that the Act

would assist prosecution where "the 'top men' of a given criminal operation

resided in one State but conducted their illegal activities in another").

Beyond Attorney General Kennedy's letter and testimony before Congress

regarding the foundational Travel Act, the main substantive historical source for

the current murder-for-hire statute is found in a 1984 Senate Subcommittee Report

on the Comprehensive Crime Control Act of 1984.[14] See S. Rep. No. 98-22 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3484. This report contains language conveying the intended scope of the statute's jurisdictional element.

For example, the report states that the drafters sought "to ensure that the new murder-for-hire statute [would be] used in appropriate cases to assist the states rather than to allow the usurpation of significant cases by federal authorities that could be handled as well or better at the local level." 1984 U.S.C.C.A.N. at 3484; see also Paredes, 950 F. Supp. at 588 ("[T]his brief quotation from the legislative history confirms that even before the mushrooming of interstate communication technology such as beepers, cellular phones and email, Congress was concerned that the murder-for-hire statute would allow federal 'usurpation' of essentially local cases."). In this regard, "the committee [noted its] aware[ness] of the concerns of local prosecutors with respect to the creation of concurrent federal jurisdiction in an area, namely murder cases, which has heretofore been the almost exclusive responsibility of state and local authorities." 1984 U.S.C.C.A.N. at 3484. As the report explicitly states, "the committee fully appreciate[d] that many state and local police forces and prosecutor offices are quite capable of handling a murder-for-hire case notwithstanding the presence of some interstate aspects." Id.

---

[14] As noted in Part II(A), supra, the Comprehensive Crime Control Act amended the Travel Act and added the murder-for-hire provision.

Thus, while the report notes that the proposed statute allows that "the option of federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value and the proper federal nexus . . . is present," id., this "does not mean, nor does the committee intend, that all or even most such offenses should become matters of federal responsibility." Id. Rather, to the extent that federal jurisdiction is sought over crimes with an interstate component, it "should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved" and "the relative ability of the federal and state authorities to investigate and prosecute." Id. (emphasis supplied). These passages from the Senate Subcommittee report indicate that the drafters intended § 1958(a)'s jurisdictional element to require at least some "interstate aspects" beyond the mere intrastate use of a car, telephone, or other facility capable of interstate commerce.

Further support for a narrow reading of the murder-for-hire statute is found in the examples that the report provides of the requisite jurisdictional nexus. The report states that:

> an interstate telephone call is sufficient to trigger federal jurisdiction, as it is under the [International Traffic in Arms Regulations, 22 C.F.R. §§ 120.1-130.17 (1990)] statute. Both the person who ordered the murder and the 'hit man' would be covered by the new section provided the interstate commerce or mail nexus is present.

Id. (emphasis supplied). This passage makes plain that the Subcommittee contemplated federal jurisdiction only over cases where the participants used facilities in the course of interstate commerce. Indeed, it would make little sense for the Subcommittee expressly to indicate that an "interstate telephone call is sufficient to trigger federal jurisdiction" if it intended that all phone calls – regardless of origin or destination (i.e., even intrastate calls) – could achieve this end.[15] Id.

In sum, the report demonstrates that the Senate Subcommittee did not intend to federalize murder-for-hire schemes with merely tenuous links to interstate commerce. Instead, only "crimes with interstate features" were to be prosecuted federally. Id. The very notion "[t]hat a defendant who never travelled from one state to another, conducted an interstate transaction, or communicated across state lines could now be prosecuted under this Act because of the evolution in communications technology runs against the grain of the statute's legislative history." Paredes, 950 F. Supp. at 588; see also Archer, 486 F.2d at 685 ("Both the legislative history summarized in our opinion and the additional extracts relied on in the Government's petition show that the overriding Congressional purpose was

---

[15] This disjoint between the legislative history and an expansive interpretation of § 1958(a)'s jurisdictional element was noted by the dissenters in Marek, who observed, "[t]he report does not assert that any use of a telephone is sufficient. Instead, it suggests that the actual use must be in interstate or foreign commerce." Marek, 238 F.3d at 327 (Jolly, J. dissenting).

25

to permit the federal government to act against members of organized crime whose activity crossed state lines when local law enforcement officers were unable or unwilling to do so . . . .").  Accordingly, we conclude that the legislative history strongly suggests that Congress intended § 1958(a)'s interstate nexus provision to be read narrowly rather than broadly; that is, the facility in question must actually be used in an interstate manner rather than simply be capable of such use.

*6. Conclusion Regarding Section 1958(a)'s Jurisdictional Element*

Based on the foregoing, we conclude that 18 U.S.C. § 1958(a)'s jurisdictional element requires that a defendant must actually use a facility in a manner that implicates interstate commerce, not just that the facility itself possess the capability of affecting interstate commerce.  With that issue decided, we now turn to the question of whether the government presented sufficient evidence at trial to demonstrate that Drury's telephone calls actually moved in interstate commerce.

## B.  Sufficiency of the Evidence

Whether there is sufficient evidence to support a conviction is a question of law which this Court reviews de novo.  United States v. Tarkoff, 242 F.3d 991, 993 (11th Cir. 2001).  The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (quoting

26

<u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).  "[A]ll reasonable inferences and credibility choices [are] made in the government's favor."  <u>United States v. Miles</u>, 290 F.3d 1341, 1355 (11th Cir.), <u>cert. denied</u>, 123 S. Ct. 707 (2002).

To support a murder-for-hire conviction under § 1958(a), the government must show that the defendant either (1) traveled (or caused another to travel) in interstate commerce or (2) used the mail, or used any facility of interstate commerce in a manner that qualifies as interstate commerce.  <u>See</u> 18 U.S.C. § 1958(a).  Here, there is no question that Drury did not travel in interstate commerce or use the mail "with the intent that a murder be committed."  <u>Id.</u>  Therefore, the jury's verdict will only stand if the government proved beyond a reasonable doubt that any of the telephone calls that Drury made to Valoze's cellular phone ventured outside the state of Georgia.

We conclude that the government adequately satisfied its evidentiary burden.  Drury does not dispute the government's expert testimony that the telephone calls to Valoze's cellular phone traveled through a switching center in Jacksonville, Florida before reaching their final destination.[16]  Instead, Drury simply contends that a "signal sent unintentionally and inadvertently across state

_____

[16] Drury does, however, mistakenly refer to the signal as a radio signal.  This is incorrect.  Prior to reaching the cellular tower closest to the target-user's cellular phone, a telephone signal sent from a land-line travels <u>entirely</u> through terrestrial means.  It is only after that call has been switched by the cellular provider to the cellular tower closest to the target subscriber that the signal passes via radio signals.

27

lines" is too "tenuous and insufficient" a contact for "the government to satisfy the jurisdictional element of § 1958." This argument is unavailing.

We have already determined that § 1958(a)'s jurisdictional element solely implicates the use of facilities that actually cross state lines. See supra Part II(A). Thus, the statute regulates a "channel of interstate commerce," and Congress's authority to do so is quite clear. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256 (1964) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.") (quoting Caminetti v. United States, 242 U.S. 470, 491 (1917)). Accordingly, it is of no moment that Drury's telephone calls to Valoze only incidentally and unintentionally ventured out of state. The undisputed fact is that they did. We, therefore, conclude that the government satisfied its evidentiary burden under § 1958(a).

Circuit precedent supports this conclusion. In United States v. Davila, 592 F.2d 1261, 1265 (5th Cir. 1979),[17] we held that even minimal interstate contacts are sufficient to satisfy the federal wire fraud statute's jurisdictional element. See 18 U.S.C. § 1343. Despite the tenuous nature of the interstate contact in Davila, essentially a "purely incidental" routing of a Western Union wire transfer through

---

[17] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

the state of Virginia, we upheld the defendant's conviction.  See id.  We reasoned

that, since the wire transfers could not have been consummated without the

interstate contacts, the interstate nexus was not "too minimal and incidental to

satisfy jurisdictional demands . . .; they were essential, and they went of necessity

on interstate facilities."  Davila, 592 F.2d at 1264.

The routing of Drury's telephone calls through the Jacksonville switching

center was similarly "essential" to their completion.  Though the contacts

themselves were certainly minimal, the government presented sufficient evidence

at trial of their interstate nature for a jury to have "found the essential elements of

the crime beyond a reasonable doubt." Tarkoff, 242 F.3d at 993.  We, therefore,

reject Drury's sufficiency of the evidence claim.

## C.  The "In Interstate Commerce" Jury Charge

Drury next argues that, regardless of whether the evidence presented at trial

might have been sufficient to establish the jurisdictional nexus, the district court

erred by instructing the jury that "pay telephones and cellular telephones are

'facilities in interstate commerce' under federal law."  Such an instruction, Drury

maintains, removes from the jury's consideration an essential element of a §

1958(a) violation: the interstate nexus.  Citing the Supreme Court's decision in

United States v. Gaudin, 515 U.S. 506, 510 (1995), Drury asserts that the district

court's instruction violated his right to have the jury decide whether he "is guilty of

29

every element of the crime with which he is charged, beyond a reasonable doubt." Id. (citation omitted).

The propriety of the trial court's instructions to the jury regarding § 1958(a)'s jurisdictional element is an issue of law which we review de novo. See United States v. Leonard, 138 F.3d 906, 908 (11th Cir. 1998).

Section 1958(a)'s interstate nexus requirement is an essential element of a murder-for-hire offense. See United States v. Tinoco, 304 F.3d 1088, 1105 (11th Cir. 2002) ("[T]he use of interstate facilities is a substantive element of Travel Act offenses that must be decided by the jury.") (citing United States v. Perrin, 580 F.2d 730, 737 (5th Cir. 1978)), cert. denied sub nom. Hernandez v. United States, 123 S. Ct. 1484 (2003). "The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." Gaudin, 515 U.S. at 522-23. As a consequence, Drury was entitled to have the jury determine whether § 1958(a)'s jurisdictional element was satisfied. Id. at 513 (noting that there is a "historical and constitutionally guaranteed right of criminal defendants to demand that the jury decide guilt or innocence on every issue, which includes application of the law to the facts").

We have already determined that the phrase "facility in interstate . . . commerce" is not the functional equivalent to "facility of interstate commerce."

See supra, Part II(A)(2). Whereas the latter phrase includes all facilities that are capable of effecting interstate communication, the former phrase requires that the facility actually be used in a manner that traverses state boundaries. By instructing the jury that the use of a pay or cellular phone is per se interstate commerce under § 1958(a), the district court both removed an element of the crime from the jury's consideration and did so by way of a faulty definition.[18] Thus, the district court's instructions to the jury constituted an erroneous statement of the law.

But this conclusion does not end our inquiry. In addition to finding error, we must determine whether that error provides grounds for a reversal. Chapman v. California, 386 U.S. 18, 22 (1967) ("We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."). A jury instruction which omits an element of the charged offense is subject to harmless error analysis. See Neder v. United States, 527 U.S. 1, 9 (1999) ("[A]n instruction

---

[18] The government cites our decision in United States v. Castleberry, 116 F.3d 1384, 1389 (11th Cir. 1997), in support of its contention that the district court's instruction was proper. But in that case the district court defined the phrase "interstate commerce," not "facility in interstate commerce." Moreover, the Castleberry court merely stated that "if you believe beyond a reasonable doubt that the defendant committed extortion . . . and you believe that the Government's evidence regarding the impact on interstate commerce beyond a reasonable doubt, then, as a matter of law, the jurisdictional requirements of the Hobbs Act . . . have been met." Id. This instruction, which does not state that the defendant's conduct constitutes, per se, interstate commerce, properly left it to the jury to determine whether the interstate nexus had been proven beyond a reasonable doubt.

31

that omits an element of the offense does not <u>necessarily</u> render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."); <u>Ross v. United States</u>, 289 F.3d 677, 681 (11th Cir. 2002), <u>cert. denied</u>, 123 S. Ct. 944 (2003). The appropriate harmless error test in this context is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" <u>Neder</u>, 527 U.S. at 15.

Here, the district court's jurisdictional element instruction was harmless. At trial, the government presented evidence that the telephone calls between Drury and Valoze traveled from Georgia to Florida and then back to Georgia. Drury neither offered testimony to counter this evidence nor disputed its veracity on appeal. Given that the factual foundation for the § 1958(a) jurisdictional nexus is uncontested, we cannot conclude that Drury's substantial rights were impugned by the district court's erroneous statement of the law. <u>See id.</u> We have no reasonable doubt that, had the jury been properly instructed, it would have reached the same result. <u>Neder</u>, 527 U.S. at 15. Although the district court erred in instructing the jury that telephones are <u>per se</u> "facilit[ies] in interstate commerce," we conclude that this error was harmless.

**D.  Truthful Person Evidence Under Fed. R. Evid. 608(a)(2)**

Drury next challenges the district court's decision to exclude evidence that he is a truthful person. Drury contends that the government affirmatively

challenged his believability.[19]  As such, Drury argues that the district court abused its discretion by barring rehabilitative evidence under the "otherwise attacked" provision in Rule 608(a)(2) of the Federal Rules of Evidence.[20]

This Court reviews a district court's evidentiary rulings for "a clear abuse of discretion."  Tinoco, 304 F.3d at 1119 (citation omitted).  A district court's evidentiary rulings will only be reversed if the resulting error "affected the defendant's substantial rights."  Id. (citing United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999)).  "The trial judge is given broad discretion in ruling on the admissibility of character testimony."  United States v. Solomon, 686 F.2d 863, 874 (11th Cir. 1982).

After a careful review of the pertinent exchanges between the government's counsel and Drury, we conclude that the district court did not abuse its discretion in excluding the proffered testimony.  In general, "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but

---

[19] Drury also contends that the government evidenced its intent to attack his character during a sidebar meeting with the trial judge.  In that conversation, the government's attorney stated that "[t]his is not a collateral material [sic], he has made character an issue in his defense."  But either mistakenly or with intent, Drury takes this statement entirely out of context.  In reality, that quoted statement referred not to Drury's "character for truthfulness," but to the "character of the relationship" between himself and Whatley, as is shown by a statement made by the prosecutor a few seconds earlier:  "this defendant has made it a linchpin of his defense that his relationship with Mr. Whatley was of a particular character."  Therefore, we decline to address this purported error.

[20] Rule 608(a)(2) states that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."  Fed. R. Evid. 608(a)(2) (emphasis supplied).

evidence of a witnesses' [sic] truthful character is admissible only after character for truthfulness has been attacked." United States v. Hilton, 772 F.2d 783, 786 (11th Cir. 1985) (citing Fed. R. Evid. 608(a)) (emphases supplied). An "attack" that consists of "Government counsel pointing out inconsistencies in testimony and arguing that the accused's testimony is not credible does not constitute an attack on the accused's reputation for truthfulness within the meaning of Rule 608." United States v. Danehy, 680 F.2d 1311, 1314 (11th Cir. 1982). This is precisely what occurred during the government's cross-examination of Drury and, therefore, the district court did not abuse its discretion in excluding the desired reputation for truthfulness testimony.

### E.  Prior Consistent Statements Under Fed. R. Evid. 801(d)(1)(B)

Drury advances two arguments in support of his assertion that the district court abused its discretion in refusing to allow his son Don to testify regarding a statement Drury made subsequent to his arrest. First, he contends that the statement was admissible under Rule 613(b) of the Federal Rules of Evidence as a prior consistent statement that "may be used for rehabilitation when the statement has a probative force bearing on credibility beyond merely showing repetition." See United States v. Pierre, 781 F.2d 329, 333 (2d Cir. 1986). Drury claims that Don's testimony would have rebutted the government's charge that he fabricated the role-playing story and is probative of his credibility on this issue. Second,

34

Drury argues that under Fed. R. Evid. 801(d)(1)(B), his statements to his son should have been admitted because they were made before he had the motive or opportunity to fabricate a story. See Fed. R. Evid. 801(d)(1)(B). Drury avers that the district court abused its discretion by simply applying a "temporal litmus test," determining that since the statements were made after the arrest Drury possessed a motive to fabricate and the statements were not admissible. See United States v. Prieto, 232 F.3d 816, 822 (11th Cir. 2000) (rejecting a "bright line rule that motive to fabricate necessarily and automatically attaches upon arrest").

"A district court is granted broad discretion in determining the admissibility of a prior consistent statement under Fed. R. Evid. 801(d)(1)(B) and will not be reversed absent a clear showing of abuse of discretion." Id. at 819 (citing United States v. Reed, 887 F.2d 1398, 1405 (11th Cir. 1989)).

The district court did not abuse its discretion in denying Drury's request to admit his son's testimony regarding the alleged prior statements. First, contrary to Drury's assertions, Rule 613(b) is inapplicable to the facts of this case. That rule is pertinent only where a party seeks to introduce "extrinsic evidence of a prior inconsistent statement by a witness . . . ." Fed. R. Evid. 613(b). Drury's proffered statement was not "a prior inconsistent statement"; rather, it was consistent and, therefore, Rule 613(b) does not apply. Second, Drury's reliance upon Rule

35

801(d)(1)(B)[21] and <u>Prieto</u> for the proposition that the district court abused its discretion by applying a "temporal litmus test" to the proffered statements is also misplaced. It is true that in <u>Prieto</u>, 232 F.3d at 820, we declined to adopt a "bright line, <u>per se</u> rule [under Fed. R. Evid. 801(d)(1)(B)] barring the admission of any prior consistent statements made by a witness following arrest." But we also stated that "whether a witness had a motive to fabricate when [the] prior consistent statements were made is plainly a question of fact to be resolved by the trial court based precisely on the particular circumstances of an individual case." <u>Id.</u> at 821. Here, after reviewing the proffered statement, the district court concluded that "[i]n my view, the conditions established by this case of the admissibility of such a statement have not been established here." While a more detailed set of findings on this topic would have eased our inquiry, the record provides ample support for the district court's determination that Drury, subsequent to his arrest, had adequate motive and opportunity to fabricate the story that he allegedly told his son. <u>See id.</u> at 821. Accordingly, we conclude that the district court did not clearly abuse its discretion in this regard.

## F. Refused Jury Instructions

[21] Rule 801(d)(1)(B) states:
> A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."

Fed. R. Evid. 801(d)(1)(B).

Lastly, Drury urges this Court to find error in the district court's refusal to give two requested jury instructions. The first proposed instruction, quoted in full supra Part I, addresses improper investigative techniques and the credibility inferences that jurors may draw from them regarding the testimony of government witnesses. Drury contends that the district court's credibility instructions were insufficient due to over-breadth and severely hindered his defense. The second instruction that Drury proposed is 11th Circuit Pattern Jury Instruction 6.7, also quoted in full supra Part I, which concerns a witness's reputation for truthfulness in the community. Drury argues that the district court abused its discretion in declining to provide this instruction because Whatley, whom Drury characterizes as the crux of the government's case, was shown at trial to have a bad reputation for truthfulness in the community.

"This Court reviews a district court's refusal to give a proposed jury instruction for an abuse of discretion." United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000). "The district court's refusal to give the requested instruction is reversible error only if (1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001).

37

We find no error in the district court's decision not to give Drury's requested instructions. Drury's suggested non-pattern charge was superfluous, as the instruction that the district court did provide adequately addressed the issue of witness credibility. The "district court has broad discretion in formulating its charge as long as the charge accurately reflects the law and the facts." United States v. Gold, 743 F.2d 800, 819 (11th Cir. 1984). Because the charge given adequately presented the law and the facts regarding witness credibility, we conclude that the district court did not abuse its discretion by refusing to give Drury's proposed instruction. See United States v. Fulford, 267 F.3d 1241, 1246 (11th Cir. 2001).

Nor did the district court abuse its discretion by declining to give 11th Circuit Pattern Jury Instruction 6.7. Clearly, this charge is "substantially correct" and, thus, satisfies the first prong of the jury instruction analysis. United States v. Roberts, 308 F.3d 1147, 1153 (11th Cir. 2002), cert. denied, 123 S. Ct. 2232 (2003). With regard to the second prong, we agree that it is a close question whether the charge provided by the district court adequately covers the same territory as the pattern instruction proffered by Drury. We admit some level of concern because, while the requested instruction refers to a witness's "reputation for truthfulness in the community," see 11th Cir. Pattern J. Instr. 6.7 (emphasis added), the charge given concerns solely the believability and truthfulness of a

38

witness. However, even assuming arguendo that the proposed pattern instruction was not sufficiently addressed in the charge actually given by the district court, see Roberts, 308 F.3d at 1153, we nonetheless conclude that Drury's assignment of error must fail under the third prong of the analysis. See id. Specifically, Drury has not shown that "the [district court's] failure to give the [requested] instruction substantially impaired [his] ability to present an effective defense." Id.

We perceive no impediment to Drury's effective defense in this particular case. This conclusion is bolstered by the fact that the district court permitted Drury to argue vigorously to the jury that Whatley possessed a bad reputation for truthfulness through (1) the testimony of two character witnesses, (2) a cross-examination of Whatley, and (3) the defense's closing arguments. See United States v. Ryan, 289 F.3d 1339, 1345 (11th Cir.), cert. denied, 123 S. Ct. 324 (2002); see also United States v. Chirinos, 112 F.3d 1089, 1101 (11th Cir. 1997) (finding that the district court's failure to instruct did not impair the defendant's ability to defend where the court permitted defendant to elicit supporting testimony and to make closing arguments on the issue). Coupled with the arguably satisfactory truthfulness instruction that the district court did provide, we conclude that the court did not abuse its discretion by refusing Drury's proposed pattern jury instruction.

## III. CONCLUSION

Based on the foregoing, we **AFFIRM** Drury's murder-for-hire convictions under 18 U.S.C. § 1958(a). We also **AFFIRM** Drury's conviction under 18 U.S.C. § 924(c).

MARCUS, Circuit Judge, concurring specially:

I agree with the majority that appellant Carl M. Drury's convictions should be affirmed, and accordingly I join in the result reached by my colleagues. I also agree that none of the district court's evidentiary rulings challenged by Drury constituted an abuse of discretion, and I join in sections D and E of the majority opinion. Moreover, the majority correctly concludes that the district court did not err in refusing to charge the jury as requested by appellant, and accordingly I join section F of its opinion as well.

However, I strongly disagree with the majority's conclusion that 18 U.S.C. § 1958's jurisdictional element can be satisfied only by a showing that the action taken in furtherance of a murder-for-hire scheme involved the actual crossing of state lines. Instead, I have little doubt that the purely intrastate use of <u>an instrumentality of interstate commerce</u> is sufficient to confer jurisdiction under § 1958. As such, I am unable to join in section A of the majority opinion.[1] As a corollary, I also respectfully disagree with the majority's determination in section C of its opinion that the district court erred under <u>United States v. Gaudin</u>, 515 U.S. 506, 115 S. Ct.

_____

[1] I agree with my colleagues that the actual interstate use of a facility, e.g., the crossing of a cellular telephone signal from Georgia to Florida and back, plainly confers jurisdiction under § 1958(a). However, because I believe that such actual interstate movement is unnecessary to satisfy this section's jurisdictional requirement, I do not join section B of the majority opinion.

2310, 132 L. Ed. 2d 444 (1995), by instructing the jury that a telephone is per se a facility in interstate commerce.

In United States v. Lopez, the Supreme Court reaffirmed that there are "three broad categories of activity that Congress may regulate under its commerce power." 514 U.S. 549, 558, 115 S. Ct. 1624, 1629, 131 L. Ed. 2d 626 (1995). "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce[,] i.e., those activities that substantially affect interstate commerce." Id. at 558-59, 115 S. Ct. at 1629-30 (citations omitted) (emphasis added). Of particular interest in this case is the second type of regulation that may legitimately be undertaken pursuant to the commerce power, the regulation of the instrumentalities of interstate commerce.

There can be little doubt that where Congress chooses to exercise the full extent of its commerce power it can proscribe the purely intrastate use of an instrumentality of interstate commerce. Indeed, almost without exception, the courts of appeals have upheld that power of Congress to proscribe wholly intrastate activities using the instrumentalities of interstate commerce. See, e.g., United States v. Hasner, __ __

42

F.3d __ (11th Cir. 2003) (holding that the jurisdictional requirement of the federal mail fraud statute, 18 U.S.C. § 1341, was satisfied by the intrastate delivery of a letter by Federal Express, concluding specifically that "Congress properly exercised its power under the Commerce Clause[,] U.S. Const. art. I, § 8, cl. 3[,] by regulating private and commercial carriers as instrumentalities of interstate commerce--even though the conduct took place entirely intrastate"); United States v. Gil, 297 F.3d 93, 100 (2d Cir. 2002) (upholding the defendant's mail fraud conviction against a Commerce Clause challenge, reasoning that "private and commercial interstate carriers, which carry mailings between and among states and countries, are instrumentalities of interstate commerce, notwithstanding the fact that they also deliver mailings intrastate"); United States v. Photogrammetric Data Servs., Inc., 259 F.3d 229, 249-52 (4th Cir. 2001) (upholding the constitutionality of the mail fraud statute, 18 U.S.C. § 1341, as applied to intrastate mailing placed with private or commercial interstate carriers), cert. denied, 535 U.S. 926, 122 S. Ct. 1295, 152 L. Ed. 2d 208 (2002); United States v. Baker, 82 F.3d 273, 275-76 (8th Cir. 1996) (upholding a conviction under the Travel Act, 18 U.S.C. § 1952(a) (2000), based on an extortion victim's use of an automatic teller machine . . . that "triggered an entirely intrastate electronic transfer" between two local banks, because an interstate network of ATMs is an instrumentality of interstate commerce).

43

onsonant with this nearly uniform view of Congress's power to proscribe the intrastate use of the instrumentalities of interstate commerce, the courts of appeals, including the old Fifth Circuit,[2] routinely have held the interstate commerce requirement of various federal criminal statutes to be satisfied by the defendant's use of a telephone, because telephones -- even when used to communicate with another person in the same state -- are instrumentalities of interstate commerce. See, e.g., United States v. Gilbert, 181 F.3d 152, 159 (1st Cir. 1999) (upholding a conviction under 18 U.S.C. § 844(e) against a Commerce Clause challenge, reasoning that "[t]he use of the telephone in this case to make a bomb-threat was, without more, sufficient to sustain jurisdiction under the interstate commerce clause"); United States v. Clayton, 108 F.3d 1114, 1117 (9th Cir.1997) (holding that because cellular telephones and cellphone ID numbers are instrumentalities of interstate commerce, protectable under the second category of Lopez, no further inquiry was necessary to sustain a conviction under 18 U.S.C. § 1029(a)); United States v. Kunzman, 54 F.3d 1522, 1526-27 (10th Cir. 1995) (upholding the sufficiency of the indictment for money laundering where it alleged the use of a telephone to accomplish the scheme in question, saying specifically that "[t]he indictment . . . specifically

---

[2]By "old Fifth Circuit," I mean simply the Fifth Circuit prior to its division into the Fifth and Eleventh Circuits. Notably, in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

44

alleges an effect on interstate commerce through the use of interstate highways, <u>the use of telephone</u> and mails, and transactions involving banks and financial institutions engaged in interstate commerce.  . . . [t]his is sufficient to allege an effect on interstate commerce") (emphasis added); <u>Loveridge v. Dreagoux</u>, 678 F.2d 870, 874 (10th Cir. 1982) ("[P]roof of intrastate telephonic messages in connection with the employment of deceptive devices or contrivances is sufficient to confer jurisdiction in a § 10(b) and Rule 10b-5 action."); <u>Alley v. Miramon</u>, 614 F.2d 1372, 1379 (5th Cir. 1980) ("This Court has consistently held that the intrastate use of the telephone may confer jurisdiction over a private action under Section 10(b) and Rule 10b-5."); <u>Dupuy v. Dupuy</u>, 511 F.2d 641, 641 (5th Cir. 1975) ("This appeal presents a narrow question of law -- Does the making of intrastate telephone calls satisfy the jurisdictional requirement of 'use of any means or instrumentality of interstate commerce' found in § 10 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5.  The district court held that it did not, and granted the defendant's motion for summary judgment on a complaint which alleged intrastate calls as the only basis for federal jurisdiction.  We reverse . . . ."); <u>McGregor Boulevard Church of Christ v. Walling</u>, 428 F.2d 401, 404 (5th Cir. 1970) (referring to a telephone as an instrumentality of interstate commerce).

Since it is almost axiomatic that Congress <u>can</u> prohibit the purely intrastate use of facilities of interstate commerce (e.g., telephones) to commit certain prohibited actions, the only question here is whether it <u>did</u> so in enacting § 1958.[3] Two of the three circuit courts to address this issue have answered this question affirmatively, concluding that § 1958(a) confers jurisdiction over the purely intrastate use of an instrumentality of interstate commerce in furtherance of a murder-for-hire scheme. See <u>United States v. Richeson</u>, __ F.3d __ (7th Cir. 2003) (holding that the

---

[3]This section provides, in full:

> **(a)** Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.
> **(b)** As used in this section and section 1959--
> **(1)** "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;
> **(2)** "facility of interstate commerce" includes means of transportation and communication; and
> **(3)** "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

18 U.S.C. § 1958.

defendant's making of <u>intrastate</u> telephone calls, standing alone, satisfied § 1958's jurisdictional requirement because "when Congress elects to regulate under the second prong of <u>Lopez</u>, 'federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement'" (quoting <u>United States v. Marek</u>, 238 F.3d 310, 317 (5th Cir.) (en banc), <u>cert. denied,</u> 534 U.S. 813, 122 S. Ct. 37, 151 L. Ed. 2d 11 (2001))); <u>Marek</u>, 238 F.3d at 320 ("[W]hen a facility employed to advance murder-for-hire is in interstate or foreign commerce generally, the jurisdictional element of § 1958 is satisfied even though the particular use of the facility on the specific occasion in question is only <u>intra</u> state.") (emphasis in original).

However, the majority in this case, like the only other circuit court decision addressing § 1958(a)'s "facility in interstate commerce" requirement, <u>United States v. Weathers</u>, 169 F.3d 336, 341-42 (6th Cir.), <u>cert. denied</u>, 528 U.S. 838, 120 S. Ct. 101, 145 L. Ed. 2d 85 (1999), concludes otherwise. My colleagues begin their analysis by accurately noting that there is a discrepancy between the language of § 1958(a), which speaks of "facilit[ies] <u>in</u> interstate commerce," and the language used in § 1958(b)(2), which defines "facilit[ies] <u>of</u> interstate commerce." They then reconcile this inconsistency by holding that the phrase "facility in interstate commerce" refers solely to facilities that are used to actually cross state lines, while "facility of interstate commerce" merely provides <u>examples</u> of facilities that

"must be used in interstate commerce to satisfy § 1958(a)." The majority concludes that because § 1958's operative -- i.e., jurisdiction-conferring -- language is that found in § 1958(a), only the actual crossing of state lines in furtherance of a murder-for-hire scheme is actionable under this section. Thus, under the majority's view, the use of an instrumentality of interstate commerce (such as a telephone) in an intrastate manner is insufficient to confer federal jurisdiction under § 1958(a). My colleagues attempt to bolster this conclusion by invoking various canons of statutory construction, including the unremarkable maxim that all words in a statute must, to the extent possible, be afforded independent meaning, the clear statement rule, and the rule of lenity. They also find support for their construction in § 1958's legislative history.

Simply stated, I believe that the majority's attempted reconciliation of § 1958(a) and (b)(2) does violence to § 1958's basic language and its overarching statutory scheme. I also find unpersuasive its reliance on the interpretive canons mentioned above and § 1958's legislative history. More particularly, there are four distinct reasons why I disagree with my colleagues' interpretation of this section. First, their reading of § 1958 is linguistically implausible. In this vein, I find persuasive the textual analysis of the Fifth Circuit in <u>Marek</u>. <u>See</u> 238 F.3d at 316. The <u>Marek</u> defendant[4]

---

[4]The <u>en banc</u> <u>Marek</u> decision actually resolved two different appeals in factually analogous cases under the murder-for-hire statute. My discussion will focus on the Fifth Circuit's evaluation of the <u>Marek</u> case, where the defendant made an intrastate transfer of funds by Western Union.

had tried to effect his murder-for-hire scheme by transferring funds between points within the State of Texas using Western Union, which uncontroversially is an instrumentality of interstate commerce. See id. at 313. In determining whether this entirely intrastate use of an instrumentality of interstate commerce satisfied § 1958(a)'s jurisdictional requirement, the court began by observing that "[t]he key question of statutory construction presented . . . is whether, under the use prong of § 1958, the phrase 'in interstate or foreign commerce' modifies 'use' or modifies 'facility.'"[5] 238 F.3d at 316. The court held that:

> Purely from a structural viewpoint, . . . "in interstate or foreign commerce" is an adjective phrase that modifies "facility," the noun that immediately precedes it -- not an adverbial phrase that modifies the syntactically more remote verb, "[to] use." We see the former conclusion as the more natural and sensible reading of the relevant portion of the statute. Primarily because of the proximity of "in interstate or foreign commerce" to "facility," the word which that phrase modifies is facility and not use. A contrary conclusion -- that "in interstate or foreign commerce" modifies "use" -- would require a strained structural interpretation of the statute.

Id.

Notably, the Seventh Circuit recently expressed its agreement with Marek's parsing of § 1958(a), holding that:

---

[5]To reiterate, the relevant portion of § 1958 reads: "Whoever . . . uses or causes another (including the intended victim) to use . . .the mail or any facility in interstate or foreign commerce, with intent that a murder be committed . . . shall be fined under this title or imprisoned for not more than ten years, or both . . . ." 18 U.S.C. § 1958(a).

49

> We believe there is only one way to read the plain language of the murder-for- hire statute, and that is to require that the facility, and not its use, be in interstate or foreign commerce. We wholly agree with the Fifth Circuit that § 1958's construction, plain language, context in the realm of commerce clause jurisprudence, and legislative history all lead to the conclusion that "it is sufficient [under § 1958] that the defendant used an interstate commerce facility in an intra state fashion." Marek, 238 F.3d at 315. This reading of the statute makes sense from both a logical and legal standpoint; as noted in Marek, even the title of the statute, "Use of interstate commerce facilities in the commission of murder-for-hire," shows that Congress intended "interstate commerce" to modify "facility" and not "use." Id.[] at 321.

Richeson, __ F.3d at __. Indeed, it makes far more sense as a linguistic matter for the phrase "in interstate commerce" to modify the noun "facility." Had it been so inclined, Congress could easily have drafted § 1958(a) to prohibit "the use in interstate commerce of [certain] facilities." But that is not the way § 1958(a) reads. Thus, in my view, the plain language of this section indicates that so long as the facility in question is one in interstate commerce, i.e., is an instrumentality of interstate commerce, even its purely intrastate use confers jurisdiction under § 1958(a).[6]

---

[6]I recognize, as did the Marek court, the Fifth Circuit's holding in Dupuy that the "in interstate commerce"/"of interstate commerce" distinction is a meaningful one when comparing the jurisdictional elements of the Securities Act of 1933 and the Securities Exchange Act of 1934. See Marek, 238 F.3d at 319 n.44 (citing Dupuy, 511 F.2d at 642-43). Indeed, my view regarding the appropriate reconciliation of § 1958(a) and (b)(2) does not imply that "that similarly varying phraseology never can have statutory significance." Id. Rather, it is only to say that "based on the grammatical structure of § 1958 and the use of both phrases interchangeably in the statute and its legislative history, . . . Congress's particular deployment of these two prepositions in § 1958 is not dispositive of this case." Id.

Second, by straining to afford the words "in" and "of" distinct meanings, the majority has read the preface to § 1958(b) and an entire subsection -- § 1958(b)(2) -- out of the statute completely. The preface to § 1958(b) reads: "[a]s used in this section . . . -- ."[7] By holding that the phrase "facility in interstate commerce," as used in § 1958(a), is meaningfully different from the phrase "facility of interstate commerce," as used in 1958(b)(2), the majority has rendered nugatory the language "[a]s used in this section." Indeed, the only way to plausibly interpret Congress's express statement that the phrase "facility of interstate commerce" is used in § 1958(a) is to construe that phrase as synonymous with the phrase "facility in interstate commerce," which is the language actually contained in § 1958(a).

As for § 1958(b)(2), again, this subsection provides that "'facility of interstate commerce' includes means of transportation and communication." However, if "facilities of interstate commerce" are not the same as "facilities in interstate commerce," § 1958(b)(2) defines a non-existent term and as such is a functional nullity. Thus, in espousing this reading, the majority has egregiously contravened an important canon of statutory interpretation to which it claims to adhere, i.e., that all words in

[7]Thus, when read together with its preface, § 1958(b)(2) reads: "As used in this section . . . 'facility of interstate commerce' includes means of transportation and communication."

51

a statute must, to the extent possible, be afforded independent meaning and significance.

My colleagues attempt to avoid this basic problem simply by saying that the phrase "facility of interstate commerce," as set forth in § 1958(b)(2), merely provides examples of facilities "that must be used in interstate commerce to satisfy § 1958(a)." However, this argument is implausible. If the phrase "in interstate commerce," as used in § 1958(a), modifies the verb "uses," as the majority says it does, the noun "facility" is unmodified. Any facility -- whether or not it is one typically deemed an instrumentality of interstate commerce, such as a telephone -- is sufficient to confer jurisdiction under § 1958(a) so long as it is used to actually cross state lines.

I agree that the physical crossing of state borders, whether by the defendant personally or some process that he sets in motion (like a telephone call or the mailing of a letter), plainly satisfies § 1958(a)'s jurisdictional requirement. However, if the actual crossing of state borders is the only way to confer jurisdiction under this section, then in listing 2 types of facilities that, if used to cross state borders, will satisfy § 1958(a)'s jurisdictional requirement, § 1958(b)(2) does absolutely no work. Put differently, the majority reads § 1958(a) to say that any[8] (and only the) actual

---

[8]Indeed, the essentially incidental interstate movement of Drury's cellular telephone signal was about as minimal as possible. His call originated in Georgia and was received in Georgia as well; it is merely that during the intervening seconds, the signal from Drury's phone -- unbeknownst to appellant -- was momentarily routed through a switching station in Jacksonville, Florida. If this interstate movement satisfies § 1958(a), then any movement across state lines will confer jurisdiction under this section.

crossing of state borders is sufficient to invoke § 1958(a). This broad, general proposition necessarily subsumes within it the idea that any particular interstate movement, for example, the interstate use of a means of communication or transportation, is sufficient to invoke § 1958(a). Thus, under the majority's reading, the language of § 1958(b)(2) accomplishes absolutely nothing.

Moreover, I find it evident that § 1958(b)(2) is structurally housed in a definitional -- not an exemplary -- subsection of the statute, i.e., § 1958(b). Indeed, § 1958(b)(1) unquestionably <u>defines</u> the phrase "anything of pecuniary value," and, equally plainly, § 1958(b)(3) <u>defines</u> the term "State." The fact that § 1958(b)(3) does so by using the term "includes" instead of "means" -- <u>compare</u> § 1958(b)(1) ("'anything of pecuniary value' <u>means</u> anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage" <u>with</u> § 1958(b)(3) ("State" <u>includes</u> a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States") -- does not render it any less definitional. Thus, the fact that § 1958(b)(2) also uses the term "includes" does not render that subsection exemplary.

Not surprisingly, the majority cites no authority for its reconciliation of § 1958(a) and (b)(2).

This is not to dispute their recognition that § 1958(a) and (b)(2) use different language, or to say that these subsections need not be reconciled. Rather, it is

53

merely to say that the reconciliation that does the <u>least</u> damage to the language enacted by Congress -- and affords the maximum amount of credence to the canon that all words in a statute should be given effect -- is to read "facilities of interstate commerce" as being synonymous with "facilities in interstate commerce." Although this may deprive the word "of" of some independent significance, this reading is far less damaging to § 1958's statutory scheme than is the reading endorsed by the majority, and the attendant nullification of § 1958(b)(2) in its entirety.

hird, as the <u>Marek</u> court noted, in 1990 Congress enacted an amendment to the Travel Act,

18 U.S.C. § 1952 -- of which section 1958's murder-for-hire prohibition originally was a part --  clarifying that the purely intrastate use of an instrumentality of interstate commerce is sufficient to satisfy that section's jurisdictional requirement. <u>See, e.g.</u>, <u>United States v. Baker</u>, 82 F.3d 273, 275-76 (8th Cir. 1996) (upholding a conviction under § 1952(a) based on an extortion victim's use of an automatic teller machine that "triggered an entirely intrastate electronic transfer" between two local banks, because interstate network of ATMs is a facility in interstate commerce); <u>United States v. Heacock</u>, 31 F.3d 249, 255 (5th Cir. 1994) (holding that "whenever a person uses the United States Post Office to deposit, to transport, and to deliver parcels, money, or other material by means of the mail, that person clearly and unmistakably has used a 'facility in interstate commerce,' irrespective

54

of the intrastate destination of the item mailed," and that such intrastate use satisfies the jurisdictional requirement of the Travel Act). Notably, to accomplish this clarification Congress changed the language of § 1952 to mirror the language now found in § 1958(a), targeting "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility <u>in</u> interstate or foreign commerce." 18 U.S.C. § 1952(a) (emphasis added). Based on this history, the <u>Marek</u> court concluded that "[a]s Congress thus expressly made clear that § 1952 applies to intrastate mailings, and did so by importing § 1958's wording into § 1952, logic dictates that precisely the same wording in § 1958 must apply equally to intrastate use of other interstate facilities, such as Western Union." 238 F.3d at 317. I agree fully with this reasoning; Congress's clarification that the purely intrastate use of an instrumentality of interstate commerce falls within the ambit of § 1952(a) by adopting the precise wording used in § 1958(a) strongly counsels in favor of reading § 1958(a) to reach such purely intrastate activities as well.

Finally, to hold that § 1958(a) confers jurisdiction over only murder-for-hire cases involving the actual crossing of state lines is inconsistent with Congress's desire to provide broad, concurrent federal jurisdiction over cases of this type. <u>See</u> <u>Marek</u>, 238 F.3d at 323. The Senate report that accompanied the enactment of § 1958 explicitly sets forth this legislative purpose:

> [T]he committee is aware of the concerns of local prosecutors with respect to the creation of concurrent federal jurisdiction in an area, namely murder cases, which has heretofore been the almost exclusive responsibility of state and local authorities. [H]owever, the committee believes that the option of federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value and the proper federal nexus, such as interstate travel, use of the facilities of interstate commerce, or use of the mails, is present.

S. Rep. 98-225, pt. 7, at 304-05 (1983), 1984 U.S.C.C.A.N. 3182, 3484. To say that concurrent jurisdiction does not exist unless the scheme in question actually crosses state lines, and thus that Congress opted not to exercise the full extent of its Commerce power -- indeed, even the majority does not say that Congress lacked the <u>authority</u> to include within § 1958(a)'s scope the intrastate use of the instrumentalities of interstate commerce -- is facially inconsistent with the legislature's desire to provide the option of federal prosecution <u>whenever</u> "the proper federal nexus" is present. Moreover, as we discuss more fully <u>infra</u>, § 1958's legislative history strongly suggests that Congress recognized three distinct "proper federal nexus[es]," namely, "interstate travel, <u>use of the facilities of interstate commerce</u>, or use of the mails." <u>Id.</u> (emphasis added).

Thus, I believe that the phrase " in interstate commerce," as used in § 1958(a), should be read to modify the noun "facility" as opposed to the verb "uses," and is synonymous with the phrase "of interstate commerce," as used in § 1958(b)(2). The product of this reading is that the purely intrastate use of a facility in (i.e.,

instrumentality of) interstate commerce confers jurisdiction under § 1958(a). Indeed, § 1958 provides a classic example of Congress regulating the instrumentalities of interstate commerce.  As the Marek court put it, "[w]hen Congress regulates and protects under the second Lopez category . . . federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement."  238 F.3d at 317.  Here, the proofs introduced at trial establish that Drury used a cellular telephone to contact a person whom he believed to be a hitman in an attempt to arrange the murder of his wife. This, standing alone, is sufficient to confer federal jurisdiction under § 1958(a).

None of the arguments raised by my colleagues in support of their contrary holding are persuasive.  First, as explained above, the majority's linguistic parsing of § 1958(a)'s phrase "uses . . . any facility in interstate commerce" -- and specifically its conclusion that the phrase "in interstate commerce" modifies the verb "uses" -- misses the mark.  Second, I find especially unpersuasive the majority's reliance on the maxim that all words in a statute must, to the extent possible, be given independent meaning.  Although I fully agree with this rule as a canon of statutory interpretation, the majority, as I have explained, has directly undermined this

maxim by reading the preface to § 1958(b) and § 1958(b)(2) out of the statute completely.

Third, the majority attempts to support its reading of § 1958 by invoking the clear statement rule, i.e., the principle that Congress must clearly indicate its desire to deprive the states of dominion over matters traditionally within their legislative purview. See Hilton v. S.C. Pub. Rys. Comm'n, 502 U.S. 197, 209, 112 S. Ct. 560, 567-68, 116 L. Ed. 2d 560 (1991) ("[W]e have been wary of extending the effect of congressional enactments into areas traditionally governed by the States, unless Congress has directed us to do so by an unmistakably clear statement. Indeed, in the cases in which we have employed the clear statement rule outside the Eleventh Amendment context, we have recognized the rule's constitutional dimensions." (citing Gregory v. Ashcroft, 501 U.S. 452, 461, 111 S. Ct. 2395, 2401, 115 L. Ed. 2d 410 (1991) and Will v. Michigan Dep't of State Police, 491 U.S. 58, 65, 109 S. Ct. 2304, 2309, 105 L. Ed. 2d 45 (1989) and United States v. Bass, 404 U.S. 336, 349, 92 S. Ct. 515, 523, 30 L. Ed. 2d 488 (1971))). The simple response is that Congress has not truly deprived the states of anything. There is not a single murder-for-hire case that is removed from the jurisdiction of the states by § 1958. Instead, this section merely provides concurrent federal jurisdiction over murder-for-hire schemes that can be brought to bear in cases where the resources of the

federal government may be needed. As indicated in the legislative history cited by the majority, Congress did not intend that

> all or even most [murders-for-hire] should become matters of federal responsibility. Rather, federal jurisdiction should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved and the relative ability of the federal and state authorities to investigate and prosecute. . . . Cooperation and coordination between federal and state officials should be utilizd to ensure that the new murder-for-hire statute is used in appropriate cases to assist the states rather than to allow the usurpation of significant cases by federal authorities that could be handled as well or better at the local level.

S. Rep. 98-225, pt. 7, at 305 (1983), 1984 U.S.C.C.A.N. 3182, 3484. Accordingly, the federalism-based concerns of my colleagues are largely unfounded.

Similarly unpersuasive is the majority's invocation of the rule of lenity. As my colleagues recognize, one of the important principles undergirding this rule is that fairness, equity and due process dictate that a criminal law must put the defendant on notice that a given action is prohibited. If a defendant cannot determine with some measure of certainty that statute X prohibits act Y, the statute should not be construed to encompass act Y. Here, the majority says that "[a]pplied to § 1958, this rule instructs that § 1958(a)'s jurisdictional element should be interpreted to include only the use of facilities that are actually engaged <u>in</u> interstate commerce," i.e., facilities that are used to cross state lines. Yet under the majority's interpretation of § 1958, to know whether his actions were prohibited under the

federal murder-for-hire statute, Drury would have to know the precise route of the signal from the cellular telephone calls he made in furtherance of his homicidal scheme. Not only is there no evidence in the record that Drury knew that his calls were routed through a switching station in Florida, but more generally, this plainly is not a matter of which most defendants who are not telecommunications experts are likely to be aware. Thus, as is vividly illustrated by the facts of this case, the majority's reading of § 1958 undermines the fairness principle underpinning the rule of lenity. More fundamentally, it is difficult to accept the majority's implication that Drury could possibly have believed that the retention of a hitman to murder his wife was not legally prohibited.

Finally, as I view them, neither of the legislative reports cited by my colleagues actually supports their conclusion that only the use of a facility to cross state lines is actionable under this section. The Senate report discussed by the majority says that "[t]he term 'facility _of_ interstate commerce' is . . . defined to include means of transportation and communication. Thus, an interstate telephone call is sufficient to trigger federal jurisdiction." S. Rep. 98-225, pt. 7 at 306 (1983), 1984 U.S.C.C.A.N. 3182, 3485 (emphasis added). Under the majority's reading of § 1958, however, this could not be. The phrase "facility of interstate commerce" appears only in § 1958(b)(2), which is not the substantive, i.e., jurisdictional, portion of the statute. Instead, according to the majority, that section is exemplary

60

only. However, by saying that the language of § 1958(b)(2) is jurisdiction-conferring, this Senate report plainly indicates that § 1958(b)(2) authoritatively defines the substantive prohibition found in § 1958(a), thereby necessarily rendering "facilities in interstate commerce" synonymous with "facilities of interstate commerce."

In a similar vein, the same Senate report says that "the option of federal investigation and prosecution should be available when a murder is committed or planned . . . and the proper federal nexus, such as interstate travel, use of the facilities of interstate commerce, or use of the mails is present." Id. at 305, 3484 (emphasis added). This says it about as clearly as possible: the use of facilities of interstate commerce was viewed by the drafters of the federal murder-for-hire statute as one wholly independent basis for federal jurisdiction. This also strongly implies that there is no substantive difference between the "facilities of interstate commerce" to which the report refers and "facilities in interstate commerce," the use of which in furtherance of a murder-for-hire scheme is prohibited under § 1958(a). Notably, the Senate report explicitly distinguishes the use of such facilities from interstate travel, thereby indicating that the purely intrastate use of the facilities, i.e., instrumentalities, of (or in) interstate commerce is sufficient to confer jurisdiction under § 1958(a).

61

Similarly, the House report that attended the introduction of the Travel Act explicitly says that "[t]he interstate tentacles of this octopus known as 'organized crime' . . . can only be cut by making it a Federal offense to use the facilities of interstate commerce in the carrying on of [certain] nefarious activities [including crimes of violence]." H.R. Rep. No. 87-966 (1961), reprinted in 1961 U.S.C.C.A.N. 2664, 2665 (emphasis added). This plainly indicates that the drafters of what became § 1958 wanted to make illegal the use of "facilities of interstate commerce" to commit crimes of violence. That the substantive prohibition in the federal murder-for-hire statute, § 1958(a) contains the language "facilities in interstate commerce" strongly suggests that these phrases were viewed by the Travel Act's drafters as interchangeable. To conclude otherwise requires not only the assumption that the drafters of the Travel Act viewed these phrases as substantively distinct, but also that following the promulgation of H.R. 87-966, the drafters changed their minds and decided that it was not the use of facilities of interstate commerce, but rather the use of facilities in interstate commerce, that was problematic and should be prohibited under federal law. Unsurprisingly, there is absolutely no support in § 1958's legislative history for the notion that such a legislative about-face occurred.

The same House report later says that the Travel Act prohibits not only actual interstate travel in furtherance of certain activities, including the commission of a crime of violence, but "[i]t also prohibits the use of other interstate transportation facilities,

62

including the mail, under the same requirements . . . with regard to travel." Id. at 2666 (emphasis added). The report never says that the use of such facilities must be of an interstate nature. Indeed, it says simply that the mere use of the mail to commit a crime of violence is sufficient to confer Travel Act jurisdiction. I cannot see how the majority interprets this report to support the conclusion that the use of the mail (or, by necessary implication, a telephone) is insufficient, standing alone, to confer jurisdiction under § 1958.

As a corollary to my conviction that the intrastate use of an instrumentality of interstate commerce such as a telephone satisfies § 1958's jurisdictional nexus, I believe that the district court did not err under United States v. Gaudin by instructing the jury that a pay or cellular phone is a per se facility in interstate commerce.

In Gaudin, the Court reaffirmed that the Fifth and Sixth Amendments require that "criminal convictions . . . rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." 515 U.S. at 510, 115 S. Ct. at 2313. The issue in that case was whether the materiality of a false statement on a federal loan application was an element of a violation of 18 U.S.C. § 1001 that needed to be found by a jury. In holding that it was, the Court said that materiality is a classic mixed question of law and fact, and as such is properly resolved by a jury. See id. at 512-14, 115 S. Ct. at 2314-15.

63

his, to reiterate, is a "Lopez 2" case, because the government was required to establish that Drury "use[d] . . . [a] facility in interstate or foreign commerce" in furtherance of his murder-for-hire scheme. 18 U.S.C. § 1958. By contrast, this is not a "Lopez 3" case, where the requisite connection to interstate commerce is the effect of the defendant's actions on interstate commerce.[9] In my view, this is a distinction that

[9]In "Lopez 3" cases, the courts of appeals generally (but not always) have found that the requisite effect on interstate commerce is an element of the offense that, under Gaudin, must be submitted to the jury. For example, in United States v. Vasquez, the Second Circuit held that a jury charge that heroin or cocaine trafficking necessarily affects interstate or foreign commerce "may not pass muster" under Gaudin. 267 F.3d 79, 89 (2d Cir. 2001). Although the Vasquez court said that prior to Gaudin its jurisprudence deemed jurisdictional questions such as whether the alleged conduct affected interstate commerce as being properly resolved by the court, it recognized that these actually are mixed questions of law and fact that, under Gaudin, must be resolved by a jury. We held similarly in United States v. Castleberry. See 116 F.3d 1384, 1389 (11th Cir. 1997) ("Castleberry is correct that Gaudin requires a jury, and not a judge, to determine each element of the crime to which he is charged with. However, Castleberry is simply wrong in arguing that the jury in his case did not decide each element of his Hobbs Act convictions. It is clear to us that the jury decided the interstate commerce element.").

By contrast, in United States v. Gomez, an interstate arson case, the district court instructed the jury that to convict the defendant it had to find "[t]hat on or about the date charged in the indictment, the building named in the indictment was used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 87 F.3d 1093, 1097 (9th Cir. 1996). The district court then defined interstate commerce, saying: "A building is used in interstate commerce, or any activity affecting interstate commerce, if the building itself is used for a business or commercial purpose or if that building purchases, sells, or uses goods that originated or came from out of state. A residential apartment building with multiple rental units is a building in interstate commerce." Id. The Ninth Circuit affirmed, reasoning that:

> We find that these instructions properly encompassed the jury's fact-finding role. [The first] [i]nstruction . . . required the jury to find whether the building damaged or destroyed was used in interstate commerce. [The second] [i]nstruction . . . gave the proper legal test for determining whether a building affects interstate commerce. Together these instructions required the jury to determine whether the building was a multi-unit residential building that was in use as a rental property at the time of the charged incident, which is the proper factual inquiry. If they found that it was a rental property, then the instructions required them to find that the interstate commerce element of the offense was

makes a great difference. Whereas the impact of a defendant's actions on interstate commerce is an element of offenses requiring an effect on interstate commerce, this is not so in cases where the defendant need only use a facility in (or of) interstate commerce. Indeed, the labeling of a given facility as one in (or of) interstate commerce -- or, in the terms used by these cases, as an instrumentality of interstate commerce -- is one that we and other courts of appeals previously have categorized as purely legal. See Spilker v. Shayne Labs., Inc., 520 F.2d 523, 524 (9th Cir. 1975) ("The only issue in this appeal is a simple question of law: Does the fact that the defendants made two intrastate telephone calls connected to a securities transaction satisfy the jurisdictional requirement of 'use of any means or instrumentality of interstate commerce' . . . ."); Dupuy, 511 F.2d at 641 ("This appeal presents a narrow question of law -- Does the making of intrastate telephone calls satisfy the jurisdictional requirement of 'use of any means or instrumentality of interstate commerce' found in s 10 of the Securities Exchange Act of 1934 . . . ."); Copp Paving Co., Inc. v. Gulf Oil Corp., 487 F.2d 202, 204 (9th Cir. 1973) ("[T]he production of asphalt for use in interstate highways rendered the producers 'instrumentalities' of interstate commerce and placed them 'in' that commerce as a

---

satisfied. These instructions correctly delegated the factual determination to the jury, leaving the determination of the legal standard to the court.

Id.

65

matter of law."), rev'd on other grounds by 419 U.S. 186, 95 S. Ct. 392, 42 l. Ed. 2d 378 (1974).

Instead, in cases where the government must establish that the defendant used a facility in (or of) interstate commerce, the element of the offense that must be submitted to the jury is the use of that facility, not whether the element is "in" or "of" interstate commerce. Thus, for example, where a telephone is concerned, the jury must find beyond a reasonable doubt that the telephone was used, not that the telephone is a facility in interstate commerce. Indeed, to me it is hard to imagine that a jury would be free to find that a telephone is not a facility in (or of) interstate commerce which, for the reasons set forth above, is synonymous with an instrumentality of interstate commerce. Yet the majority opinion effectively would allow one jury to conclude on Monday that a telephone is an instrumentality of interstate commerce and another jury to conclude on Tuesday, in another case, that a telephone is not an instrumentality of interstate commerce. I find it wholly implausible that Congress intended such a result.

Furthermore and quite importantly, in this case there is an even more compelling reason to say that Gaudin does not require the submission to the jury of the question whether Drury used a facility in interstate commerce. In § 1958(b)(2), Congress expressly and unambiguously has defined the phrase "facility of interstate commerce" -- which, for the reasons set forth above, must be interpreted as synonymous with

66

"facility in interstate commerce" -- to include "means of transportation and communication." 18 U.S.C. § 1958(b)(2). Accordingly, it is simply untenable to say that the satisfaction of section 1958's "facility in interstate . . . commerce" requirement -- as opposed to the requirement that such a facility be <u>used</u> -- is an element of the offense that must be submitted to the jury. Chief Justice Rehnquist, concurring in <u>Gaudin</u>, undertook a discussion that bears directly on this point. He wrote:

> Nothing in the Court's decision stands as a barrier to legislatures that wish to define -- or that have defined -- the elements of their criminal laws in such a way as to remove issues such as materiality from the jury's consideration. We have noted that "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." Within broad constitutional bounds, legislatures have flexibility in defining the elements of a criminal offense.

515 U.S. at 525, 115 S. Ct. at 2321 (Rehnquist, C.J., concurring) (quoting <u>Staples v. United States</u>, 511 U.S. 600, 604, 114 S. Ct. 1793, 1796, 128 L. Ed. 2d 608 (1994)) (other citations omitted). Thus, even were the nature of a particular facility (or instrumentality) -- as opposed to the defendant's use of that facility -- an element that in the context of other statutes would have to be submitted to the jury under <u>Gaudin</u>, the satisfaction of this requirement has been legislatively determined here. By expressly defining the phrase "facility in[/of] interstate . . . commerce," Congress may fairly be said to have eliminated this as an element of

67

the murder-for-hire offense under § 1958 and thus removed it from the jury's consideration.

In short, I believe the majority has read § 1958(a)'s jurisdictional requirement in an overly constrictive manner. It has done so by parsing the language of this subsection and of § 1958(b)(2) in a way that lacks textual foundation and is not supported by -- indeed, directly undermines -- the canons of statutory interpretation on which it purports to rely or by § 1958's legislative history. This error also has led my colleagues to find error under Gaudin where none truly exists. Despite these basic analytical flaws, however, the majority's ultimate resolution of this case is correct because it affirms Drury's conviction in all respects. Accordingly, I concur in the judgment reached.